## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| INGRID ANDERSON, *et al.* | : | Case No. 1:14-cv-151 |
| | : | |
| Plaintiffs, | : | |
| | : | Judge Timothy S. Black |
| vs. | : | |
| | : | |
| CITY OF BLUE ASH, OHIO, | : | |
| | : | |
| Defendant. | : | |

## ORDER GRANTING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. 13)

This civil action is currently before the Court on Defendant's Motion for Summary Judgment (Doc. 13) and the parties' responsive memoranda. (Docs. 23 & 24).

## I.     FACTS[1]

Defendant City of Blue Ash has enacted zoning laws regulating respective land uses throughout the City. Plaintiff Anderson lives in an area zoned R-3 Residential, which is strictly for residential purposes. (Doc. 7 at 2). The Zoning Code specifically lists the land uses that are permitted in each district. If a use is not listed, then it is prohibited. (*Id.*) Moreover, as specifically at issue here, Section 505.21 of the Blue Ash Codified Ordinance prohibits sheltering, maintaining, keeping, or harboring of "farm" animals on residential property, including miniature horses, alpacas, and pigs. However, this Ordinance does not apply to animals otherwise specifically permitted by federal law. (Doc. 8-3 at 13).

---

[1] The parties agree that the undisputed facts of this case have already been identified by the parties and analyzed by the Court in connection with Plaintiffs' Motion for Preliminary Injunction. (*See* Doc. 23 at 2; Doc. 24 at 1).

In 2010, Plaintiff C.A.'s physician, Dr. Ron Levin, recommended and prescribed hippotherapy for Plaintiff C.A. (Doc. 1 at ¶ 28). Hippotherapy literally refers to treatment or therapy aided by a horse. Dr. Levin defined hippotherapy to include "several avenues of traditional therapy including physical, occupational, speech and language." (Doc. 8-10 at 36). Dr. Levin prescribed that the hippotherapy be conducted at Plaintiff C.A.'s home in the presence of one or more therapists with expertise in physical, occupational, speech, and language therapy. (*Id.*) Dr. Levin further states that this therapy is to be at a level in which Anderson *and provider* are comfortable with …" (*Id.*) (emphasis added). All parties agree that hippotherapy can be accomplished by taking C.A. to a local stable or farm. (Doc. 7 at 4).

Plaintiff Anderson obtained a miniature horse for Plaintiff C.A.'s hippotherapy in 2010. (Doc. 1 at ¶¶ 30, 54). In August, 2010, Defendant's Community Development Director & Zoning Administrator began receiving citizen complaints about a miniature horse on Plaintiff Anderson's property. (Doc. 8-1 at 18-19). The first complaint alleged "extremely offensive" smell, "health issues," and that Plaintiff Anderson's actions were de-valuing the surrounding homes. (*Id.*) Following this complaint, the Hamilton County Public Health Department issued "Outdoor Animal Waste Clean-Up" guidelines to standardize the manner in which it would respond to animal waste complaints and clean-up of animal waste. (*Id.* at 20). As a result, Defendant's Community Development Director ordered that the miniature horse be removed. The Board of Zoning Appeals ("BZA") denied Anderson's appeal seeking approval to keep this miniature horse. Nevertheless, Defendant decided to forestall enforcement at that time to assist Plaintiff

2

Anderson and her child. (*Id.* at 22).

Plaintiff Anderson obtained a second miniature horse in 2011. (Doc. 7 at 6). Plaintiff Anderson obtained a physician's letter from Dr. Derek Fletcher dated August 16, 2011 in support of two miniature horses. (Doc. 8-1 at 33). At this time, Plaintiff Anderson also maintained a service dog for Plaintiff C.A. to detect seizures; and, moreover, Defendant alleges there were also five other dogs on her property at this time. (Doc. 1 at ¶ 50; Doc. 7 at 6). Defendant cited Plaintiff Anderson for the second miniature horse, and the Defendant's Community Development Director asked her to permanently remove this horse on February 27, 2012. (Doc. 8-1 at 35). On March 8, 2012, Anderson appealed to the BZA, seeking permission for a second miniature horse and in support, submitted a letter from Dr. Derek Fletcher. (*Id.* at 36-38). This is the last written correspondence from Dr. Fletcher, or any other medical doctor, concerning Plaintiff C.A. and hippotherapy. (Doc. 7 at 6). On April 9, 2012, the BZA affirmed the Community Development Director's decision after an evidentiary hearing. (Doc. 8-2). The BZA found that neither miniature horse on Anderson's property was a service animal under the Americans with Disabilities Act ("ADA"). (Doc. 8-1 at 28).

Unrelated to the Blue Ash administrative proceedings, in March 2012, the Hamilton County Public Health Department issued notice to Plaintiff Anderson's counsel, noting that a complaint had been made concerning Plaintiff Anderson's possession of farm animals on a residential property and the unsanitary conditions existing there. (*Id.* at 34). Specifically, the Hamilton County Public Health Department Inspector documented that a pig, two miniature horses, and a chicken coop were on the

property and that animal waste was causing runoff and odors. (*Id.*) The Inspector recommended a plan of action to control the animal waste. (*Id.*)

Plaintiff Anderson properly appealed the BZA's decision to City Council on May 16, 2012. She submitted a brief outlining the reasons for her appeal on June 27, 2012, specifically arguing that Defendant was required to accommodate the horses under the ADA. (Doc. 8-3 at 1-3). The Blue Ash City Council ("Council") considered the BZA's decision on June 14, 2012, August 9, 2012, and September 13, 2012, and ultimately denied Anderson's appeal and affirmed the BZA's decision. (Doc. 8-1 at 21). Specifically, the Council found that Anderson's physician letters never characterized the miniature horses as service animals. (*Id.* at 24). The Council found that the miniature horses at issue were not service animals because they did not assist Plaintiff C.A. in indoor activities, Plaintiff C.A. was able to ambulate without the horses, the horses were not housebroken, Plaintiff Anderson's property was admittedly not big enough for even one miniature horse to be "healthy-happy," and the horses did not attend school with Plaintiff C.A. nor help her with any of life's daily activities. (*Id.* at 25-31). Plaintiff Anderson never appealed this administrative decision under Chapter R.C. 2506. (Doc. 7 at 7).

Plaintiff Anderson has had four different miniature horses in the last five years. (Doc. 8-10 at 40). During the BZA hearing on April 9, 2012, Plaintiff Anderson's two miniature horses were named Jack and Lacey. (Doc. 8-2 at 9). After the Council denied Plaintiff Anderson's appeal and required her to remove these miniature horses from the property, Plaintiff Anderson obtained a different miniature horse, Ellie. (Doc. 1 at ¶ 27).

4

On November 8, 2013, two health inspectors went to Plaintiff Anderson's property and observed a miniature horse, alpaca, pig, and several dogs.  (*Id.* at 9-12).  When the health inspectors arrived on Plaintiff Anderson's property, she initially stated that the miniature horse and alpaca were not on the property.  (*Id.*)  The health inspectors walked around the property and noticed an odor by the back fence.  As they peeked through the fence, they saw the miniature horse, alpaca, and a pig.  (*Id.*)  After their investigation, Plaintiff Anderson admitted that she had six dogs, a pig, a miniature horse, an alpaca, and some outdoor cats.  (*Id.*)

On December 4, 2013, the Hamilton County Public Health Department issued a Notice of Violation to Plaintiff Anderson for excessive animal waste, flies throughout the house, odor due to animal urine, and a rear door off its hinges.  (Doc. 8-3 at 6-7).  The Hamilton County Public Health Department asserted that Plaintiff Anderson was in violation of its regulations and Ohio law, and it required her to remove pet waste, sanitize the property's basement, plant grass to prevent animal waste run off into neighboring properties, and maintain the house by regular cleaning to reduce or eliminate the flies.  (*Id.* at 6-7).

Subsequently, in January 2013, Defendant Blue Ash passed an ordinance disallowing farm animals.  (*Id.*)  Immediately prior to this ordinance taking effect, Plaintiff Anderson was informed that possession of a horse and alpaca on her property would be illegal going forwqard.  (Doc. 8-3 at 8; Doc. 1 at ¶ 66).  After this ordinance became effective, a member of the Blue Ash Police visited Plaintiff Anderson's property to inquire whether she had removed the miniature horse and alpaca from her property in

conformity with the ordinance after another complaint was made to Defendant. (Doc. 8-3 at 14-15; Doc. 1 at ¶ 67). Despite the ordinance, Plaintiff Anderson had a horse and alpaca on her property. The police officer informed Plaintiff Anderson that he would return to the property to ensure compliance with the ordinance at a later date. (*Id*.) On March 15, 2013, the Blue Ash Police spoke with Plaintiff Anderson to confirm that she had removed the animals from her property and she responded that she had done so. (Doc. 8-3 at 16; Doc. 8-4 at 22-24). However, on July 4, 2013, the Blue Ash Police Department received a complaint regarding Plaintiff Anderson's property, so an officer was dispatched to respond. (*Id.* at 24). On July 8, 2013, the officer observed a miniature horse and an alpaca and photographed them. (Doc. 8-10 at 1-14). On July 16, 2013, the officer again visited Plaintiff Anderson's property and observed the miniature horse and alpaca. (*Id.* at 15-16).

On July 8 and 16, 2013, Plaintiff Anderson was cited for two violations of the farm animal ordinance, specifically for keeping a miniature horse and an alpaca at her residence. She was tried in Mayor's Court and convicted. (Doc. 7 at 11). She then appealed to the Municipal Court and was again convicted on November 13, 2013. (Doc. 8-10 at 17; Doc. 1 at ¶ 75). Plaintiff Anderson's principal defense was that she was entitled to keep the horse and the alpaca because they were permitted by federal law. (Doc. 8-4 at 57-66, 76-82, 92-94; Doc. 8-10 at 17-32). However, Plaintiff Anderson never appealed these convictions. (Doc. 7 at 11).

On January 2, 2014, Plaintiff Anderson filed a Housing Discrimination Charge with the Department of Housing and Urban Development and the Ohio Civil Rights

6

Commission ("OCRC").  (Doc. 8-10 at 33-35).  In this charge, Plaintiff Anderson alleges

that she and Plaintiff C.A. are being discriminated against on the basis of her daughter's

disability under Section 804(f) of Title VIII of the Civil Rights Act of 1968, as amended

by the Fair Housing Act of 1988 ("FHA").  (*Id.*)  The case is still under investigation and

no decision has been made.  (Doc. 7 at 12).  Plaintiffs' Complaint also alleges a claim

under the ADA, specifically 28 C.F.R. §§ 35.130(b)(7), 35.136.  (Doc. 1).  The Equal

Employment Opportunity Commission ("EEOC") has not issued a right to sue letter.

(Doc. 7 at 12).

## II.    STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to

the Court demonstrates that there is no genuine issue as to any material fact, and that the

movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  *See Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986);  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 247-48 (1986).  The moving party has the burden of showing the absence of genuine

disputes over facts which, under the substantive law governing the issue, might affect the

outcome of the action.  *Celotex*, 477 U.S. at 323.

All facts and inferences must be construed in a light most favorable to the party

opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574,

587 (1986).  A party opposing a motion for summary judgment "may not rest upon the

mere allegations or denials of his pleading, but . . .  must set forth specific facts showing

that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 248 (1986).

### III.   ANALYSIS

The Court finds that there is no dispute of material fact precluding summary judgment in favor of Defendant.

### A.   Claim and Issue Preclusion

First, Defendant alleges that Plaintiffs' claims are barred by claim preclusion and/or issue preclusion.  Plaintiffs have previously argued that they were entitled to keep a miniature horse under the ADA and/or the FHA.  They raised their claims in an administrative proceeding in Blue Ash in 2012 and again during the criminal trial of Plaintiff Anderson in Hamilton County Municipal Court.  (Doc. 8-1 at 32; Doc. 8-4 at 57-66, 76-82; Doc. 8-13 at 1-3).  They lost and did not appeal those decisions.

When applying claim and issue preclusion, federal courts must give the same preclusive effect to state court judgments that those judgments would receive in courts of the rendering state.  *ABS Indus., Inc. v. Fifth Third Bank*, 333 Fed. Appx. 994, 998 (6th Cir. 2009) (citing *Ingram v. City of Columbus*, 185 F.3d 579, 593 (6th Cir. 1999)).  "[I]f an individual is precluded from litigating a suit in state court by the traditional principles of *res judicata*, he is similarly precluded from litigating the suit in federal court."  *Id*. at 998 (citing *Gutierrez v. Lynch*, 826 F.2d 1534, 1537 (6th Cir. 1987)).  The Sixth Circuit looks to the "state's law to assess the preclusive effect it would attach to that judgment."  *Id*.; *see also Ingram*, 185 F.3d at 593.

Under Ohio law, "a valid, final judgment rendered upon the merits bars all subsequent actions based upon any claim arising out of the transaction or occurrence that was the subject matter of the previous action."  *Grava v. Parkman Twp*., 73 Ohio St. 3d

379, 1995 Ohio 331, 653 N.E.2d 226, 229 (Ohio 1995) (citing Restatement (Second) of

Judgments §§ 24-25 (1982)).  Claim preclusion consists of four elements:

> '(1) [A] prior final, valid decision on the merits by a court of competent
> jurisdiction; (2) a second action involving the same parties or their privies,
> as the first; (3) a second action raising claims that were or could have been
> litigated in the first action; and (4) a second action arising out of the
> transaction or occurrence that was the subject matter of the previous
> action.'

*Portage County Bd. of Commirs v. City of Akron*, 109 Ohio St. 3d 106, 2006 Ohio 954,

846 N.E.2d 478, 495 (Ohio 2006) (quoting *Hapgood v. Warren*, 127 F.3d 490, 493 (6th

Cir. 1997)).  Thus, "[r]es judicata operates as a complete bar to any subsequent action on

the same claim or cause of action between the parties or those in privity with them."

*Brown v. City of Dayton*, 89 Ohio St. 3d 245, 2000 Ohio 148, 730 N.E.2d 958, 961 (Ohio

2000) (citations and internal quotation marks omitted).

Importantly, "claim preclusion not only bars all claims that were litigated, but also

all claims that could have been litigated growing from the same transaction."  *Price v.

Carter Lumber Co*., No. 24991, 2010 Ohio 4328, 2010 Ohio App. LEXIS 3658, at *15

(Ohio Ct. App. Sept. 15, 2010); *see also Schmidt v. Village of Newtown*, 1st Dist. No.

C110470, 2012-Ohio-890 (applying collateral estoppel to bar claims raised in subsequent

action that were necessarily litigated in prior administrative action and not appealed

under R.C. 2506).  "Ohio preclusion principles do not require that a claim be the same as

the claim brought in the previous matter; they only require that the claim could have been

litigated."  *Demsey v. Demsey*, 488 Fed. Appx. 1, 5 (6th Cir. 2012); *A to Z, Inc. v. City of

Cleveland*, N.D. Ohio No. 1:05CV2137, 2007 U.S. Dist. LEXIS 43666, at *29-30 (June

14, 2007).

The Court finds that Plaintiffs' claims in this action are precluded by at least
Plaintiff Anderson's criminal trial.  During that proceeding, Defendant cited Plaintiff
Anderson for keeping farm animals in violation of Ordinance 505.21 because she kept an
alpaca and miniature horse at her Myrtle Avenue property.  Plaintiff Anderson
specifically argued that she did not violate the ordinance because she was entitled to keep
the animals under the ADA or FHA.  In both the Mayor's Court hearing and the appeal to
the Hamilton County Municipal Court, Plaintiff Anderson argued that Ellie, the miniature
horse at issue then and now, was a service animal.  During the Municipal Court trial, a
representative of Plaintiff HOME testified that Ellie and the alpaca were both allowed
under the FHA.  (Doc. 8-4 at 66).  In closing argument, Plaintiff Anderson's counsel
stated:

> So to find her guilty of these two charges because they don't understand the
> ADA permits a miniature horse as a service animal it's not justice…And
> eventually it was – since we know Lieutenant Schueler goes to the dry
> cleaners and the coffee shop to make sure there's no animals in the
> backyard.  That was the small period of time that animal [alpaca] served as
> an assistance animal…I would ask before you make your decision today
> that you look through Exhibit A, Exhibit B, and Exhibit C, then consider
> whether or not that horse of a different color is entitled to be used by them
> as their service animal as they have done…[Anderson is] going to use some
> reason and common sense from now on with regard to the use of service
> animals and assistance animals…

(*Id*. at 92-94).  Notably, a HUD circular "advising on service animals and support
animals" under the ADA and FHA was Exhibit A in Plaintiff Anderson's criminal trial
and is now Exhibit 57 in this case.  (*Id.* at 59-60).  Both during that trial and now,
Plaintiffs cite it for the proposition that a reasonable accommodation was required under

either the ADA or FHA.  (Doc. 10 at 25-26).

In this present case, Plaintiffs again claim that Ellie is a "service animal."  (Doc. 1 at ¶ 27).  Plaintiffs argue that Plaintiff Anderson is not seeking to have her convictions overturned but that the decisions had no evaluation of the ADA and no mention of applicable Fair Housing law.  (Doc. 10 at 12-13).  Plaintiffs again allege that Defendant is violating both the ADA and the FHA, this time by denying Plaintiff Anderson's request for a reasonable accommodation and enforcing Ordinance 505.21.  (Doc. 13 at 19).  In the appeal of her criminal conviction to the Hamilton County Municipal Court, Plaintiff Anderson had the opportunity to argue she was entitled to keep Ellie under federal law, and she did so.  (Doc. 8-4 at 76, 81-83).

All of the elements necessary to establish preclusion are present here.  Plaintiffs raised the FHA and ADA claims in the criminal trial, the determination of these issues was necessary to the outcome of that proceeding, Judge Allen rendered a final judgment that was not appealed, and Plaintiff Anderson had a full and fair opportunity to litigate the issues.  (Doc. 22 at 11-12).  Thus, Defendant has demonstrated that claim and/or issue preclusion bar Plaintiff Anderson and her daughter's claims.

Plaintiff HOME's claims also fall with those of the other Plaintiffs.  Privity for claim or issue preclusion purposes is somewhat amorphous.  Nevertheless, a mutuality of interest, including an identity of desired result, creates privity between [parties for claim or issue preclusion]."  *ABS Indus., Inc*., 333 Fed. Appx. at 999 (citing *Brown v. City of Dayton*, 89 Ohio St. 3d 245, 248 (Ohio 2000)).  Alternatively, Ohio courts have defined privity as "such an identification of interest of one person with another as to represent the

11

same legal right." *Id*. at 999 (citing *Elec. Enlightenment Inc. v. Kirsch*, 2008-Ohio-3633, ¶ 8 (9th Dist. 2008)).

Plaintiff HOME became involved with Plaintiff Anderson in August 2013. (Doc. 1 at ¶ 11). The Municipal Court trial occurred on October 22, 2013, well after Plaintiff HOME began its assistance to Plaintiff Anderson. She was convicted in November 2013, but no appeal was taken. In the trial, Plaintiff HOME clearly identified itself with Plaintiff Anderson's interests and sought the same result. (Doc. 8-4 at 66). Indeed, one of its representatives testified in the Municipal Court trial that the horse and the alpaca were permitted under federal law. *Id*. Plaintiff HOME's interest in the state court proceedings mirrored Plaintiff Anderson's interest, and the relief that Plaintiff HOME now seeks in this Court is identical to the relief Plaintiff Anderson sought during the state court proceedings, as well as the relief she seeks in this action. Claim and issue preclusion thus also bar Plaintiff HOME's claims. *See ABS Indus., Inc*., 333 Fed. Appx. at 999-1000; *see also Bates v. Twp. of Van Buren*, 459 F.3d 731, 736 (6th Cir. 2006) (employee and business in privity where they sought facial invalidation of an ordinance and that "[i]t is of no moment that [the business] was a defendant in the earlier action whereas [the employee] is a plaintiff here"); *Evans v. Ohio Laborers Fringe Benefit Programs*, N.D. Ohio No. 5:12CV01459, 2013 U.S. Dist. LEXIS 18054, at *12-13 (Feb. 11, 2013).

Accordingly, Defendant has demonstrated that all of Plaintiffs' claims are precluded by virtue of Plaintiff Anderson's criminal trial, and, therefore, Defendant is entitled to summary judgment.

**B.**    **Service Animal Designation**

Under the ADA, a public entity must make reasonable modifications when they are necessary to avoid discrimination on the basis of disability.  This is so unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.  28 C.F.R. § 35.130(b)(7); *Access Now, Inc. v. Town of Jasper*, 268 F. Supp. 2d 973, 979 (E.D. Tenn. 2003).

To establish that Plaintiffs are entitled to a reasonable modification allowing the miniature horse, they must show that:  (1) there is a qualified individual with a disability; (2) the horse is a service animal; and (3) the horse needs to be used as a service animal under the ADA.  *Access Now, Inc*. 268 F. Supp.2d at 979.  To be a service animal under the ADA, the horse must be trained to work with or perform tasks for the benefit of the disabled individual.  28 C.F.R. §§ 35.104, 35.136(i); *Access Now, Inc*., 268 F. Supp.2d at 980.  There are no requirements as to the amount or type of training the service animal must undergo, nor the type of work or assistance the service animal must provide.  *Access Now, Inc*., 268 F. Supp.2d at 980.  Finally, Plaintiffs must show that the horse assists a disabled individual "overcome or deal with an ADA disability."  *Id*.  In contrast, an animal that simply provides comfort or reassurance does not qualify as a service animal under the ADA.  *Rose v. Springfield-Greene Cty. Health Dep't*, 668 F.Supp.2d 1206, 1215 (W.D. Mo. 2009).

The undisputed facts establish that the miniature horse is not a "service animal." The horse does not go to school with her and does not help her with any of life's daily activities.  (*Id.*)  In addition, the horse does not help Plaintiff C.A. accomplish any

activity inside her house.  (*Id.* at 29).  It is never inside the house with her.  (*Id.*)  Plaintiff

C.A. is also able to ambulate without the horse.  (*Id.*)  Plaintiff C.A. only uses Ellie in the

backyard, and nowhere else.  (Doc. 1 at ¶¶ 30, 34, 46, 78, 87; Doc. 23 at 8).  The most

recent physician letter, submitted by Dr. Fletcher and dated March 14, 2014, merely

"support[s C.A]'s use of the miniature horse as a means [to being physically active]," and

makes no reference to any need for in-home therapy or hippotherapy.  (Doc. 10-9 at 23).

No doctor has ever referred to any miniature horse as Plaintiff C.A's service animal.

(Doc. 11 at 160).  Indeed, it is undisputed that Ellie and has not been fully trained as a

service animal, is not a therapy animal, and does not provide therapy to Plaintiff C.A.

(Doc. 13-1 at 7-8, 11-12, 32-33, 38-39).

    Even assuming that Ellie qualified as a service animal, however, Plaintiffs have

not demonstrated a genuine dispute of material fact that a reasonable accommodation can

be made.  Specifically for miniature horses, the following factors are considered with

regard to this determination:

> (i) The type, size, and weight of the miniature horse and whether the facility
> can accommodate these features;

> (ii) Whether the handler has sufficient control of the miniature horse;

> (iii) Whether the miniature horse is housebroken; and

> (iv) Whether the miniature horse's presence in a specific facility
> compromises legitimate safety requirements that are necessary for safe
> operation.

28 C.F.R. § 35.136(i)(2).

    As detailed above, the presence of a miniature horse at Plaintiff Anderson's home

compromises the legitimate health and public safety concerns of Defendant and its

14

citizens. The miniature horse is not housebroken; and the property Plaintiff Anderson rents, in her own words, cannot adequately accommodate it. (Doc. 13-1 at 51; Doc. 8-1 at 29-30). **The property is two-tenths of an acre in the middle of a residential neighborhood. Plaintiff Anderson herself admits that a miniature horse needs at least one-third to one-half of an acre to be "healthy-happy.**" (Doc. 8-1 at 30). The Health Department investigations establish that the animals are creating health and safety concerns to both Anderson and to her neighbors.

Plaintiffs have therefore failed to evidence that Ellie is a service animal or that, if she were, any reasonable accommodation could be made on Plaintiffs' behalf.

## C. Intentional Discrimination

Plaintiffs also claim that Defendant intentionally discriminated against them. (Doc. 23 at 11). Plaintiffs must show the "discriminatory purpose was a motivating factor" in Defendant's decision-making. *Smith & Lee Assoc., Inc. v. City of Taylor*, 102 F.3d 781, 790 (6th Cir. 1996). Plaintiffs allege that "[t]here is extensive documentation of animus on the part of City staff in dealing with C.A.'s attempts, through her mother, to preserve her rights," but in fact Plaintiffs cite no actual evidence of animus or discriminatory purpose whatsoever, and no case holding that the facts here entitle them to proceed beyond summary judgment. (Doc. 23 at 11). Indeed, on the contrary, as the Court previously noted, Defendant decided to "forestall enforcement [of its Zoning Code in 2010] to assist Plaintiff Anderson and her child." (Doc. 22 at 2). Plaintiffs themselves admit that "Blue Ash agreed to permit the Andersons to keep a miniature horse … at their home in Blue Ash." (Doc. 1 at ¶ 58).

15

Next, Plaintiffs criticize Defendant for responding to complaints made by neighbors.  There is no dispute that complaints were made and were investigated by the Hamilton County Health Department.  (Doc. 22 at 2-6, 17-18).  Judge Allen noted in the criminal trial that "You've got neighbors that don't like you and don't like the animals it sounds like to me."  (Doc. 8-5 at 7).  Defendant had a duty to investigate complaints and report them to the proper authorities if necessary, and doing so served fundamental municipal functions – to maintain property values and community aesthetics and to protect the health and safety of neighboring individuals.  (Doc. 22 at 17-18).

Plaintiffs also fault Defendant for questioning Plaintiff Anderson's motives and intentions during this process.  (Doc. 23 at 11-12).  No authority supports any notion that such conduct gives rise to an intentional discrimination claim.  More importantly, as the Court has noted multiple times, Plaintiff Anderson has never explained why the horse must live at her residence other than for her own convenience.  (Doc. 22 at 17).  The undisputed facts show that Defendant was engaging in fundamentally legitimate municipal functions, not in unlawful intentional discrimination.  (*Id*. at 17-18).

Finally, Plaintiffs claim that Defendant passed the ordinance outlawing farm animals in order to discriminate against Plaintiffs Anderson and C.A.  (Doc. 23 at 13).  As the ordinance preamble states, it was enacted in part to address "numerous inquiries" Defendant had received over the past several years "from residents regarding the keeping of horses, pigs, goats, sheep and alpacas."  (Doc. 8-3 at 13).  Plaintiff Anderson did not even have an alpaca until after the ordinance was effective.  (Doc. 12 at 17-19).  Plus, the ordinance exempts all animals otherwise permitted by law, and Plaintiffs have not

16

challenged the constitutionality of the ordinance.  (Doc. 22 at 1).

Plaintiffs have pointed to no evidence of animus or discriminatory purpose on the part of Defendant on which an intentional discrimination claim could conceivably be predicated.

## D.    Disparate Impact

Plaintiffs also claim that Defendant's actions have a disparate impact on Plaintiff C.A.  (Doc. 23 at 14).  They argue that Plaintiff C.A. is "precluded from living" in Blue Ash if she wants to "keep her horse."  (*Id.*)  However, Defendant "has not rendered the property inaccessible for Plaintiff C.A…"  (Doc. 22 at 16).  Plaintiff C.A. "can obtain hippotherapy by traveling to a local farm or stable, and, in fact, she did so for a period of time."  (*Id.*)  Defendant has not precluded the Anderson Plaintiffs from living in Blue Ash or deprived them of an equal opportunity to "enjoy the housing of their choice." (*Id.*)  Plaintiffs have never established "that the miniature house must be housed at her property."  (*Id.* at 17).

Plaintiffs have pointed to no evidence of unlawful disparate impact.

## E.    FHA Claim

Plaintiffs allege that the miniature horse is an "assistance animal" permitted under the FHA.  Plaintiff Anderson never raised this in the administrative proceeding, but she did vociferously during the criminal trial.  In fact, Plaintiff HOME testified on her behalf that FHA accommodation was required, both for the miniature horse and the alpaca. (Doc. 8-4 at 66; 93-94).  After the Municipal Court considered the arguments and evidence, it found her guilty.

Municipalities must provide reasonable accommodations to zoning practices if they are necessary to afford residents an equal opportunity in the use and enjoyment of property. *Howard v. City of Beavercreek*, 276 F.3d 802, 805-806 (6th Cir. 2002).  To establish liability under the FHA, Plaintiffs must show: 1) Plaintiff C.A. suffers from a disability within the meaning of the FHA; 2) Defendant knew or should have known of the disability; 3) Plaintiffs' requested accommodation may be necessary to afford Plaintiff C.A. an equal opportunity to use and enjoy the dwelling; 4) the accommodation is reasonable; and 5) Defendant refused to make the requested accommodation.  42 U.S.C. § 3604(f)(3)(B); *Dubois v. Ass'n of Apt. Owners of 2987 Kalakaua*, 453 F.3d 1175, 1179 (9th Cir. 2005).

Defendant has not rendered the property inaccessible for Plaintiff C.A. and the requested accommodation is thus not reasonable.

### 1.      Necessary Accommodation

Plaintiff Anderson cannot satisfy the third element of an FHA claim by showing that her requested accommodation was necessary.

> When analyzing whether an accommodation is required under this Act, the three operative elements are 'reasonable,' equal opportunity' and 'necessary.'  An accommodation is 'reasonable' when it imposes no 'fundamental alteration in the nature of the program' or 'undue financial and administrative burdens.'  'Equal opportunity' under the FHAA is defined as 'giving handicapped individuals the right to choose to live in single-family neighborhoods, for that right serves to end the exclusion of handicapped individuals from the American mainstream.'  Linked to the goal of equal opportunity is the term 'necessary.' In order to prove that an accommodation is 'necessary,' plaintiffs must show that, but for the accommodation, they likely will be denied an equal opportunity to enjoy the housing of their choice.'

*Howard*, 276 F.3d at 806 (internal citations omitted).

18

Most instructive, in *Howard*, the court held that the plaintiff could not prove that the requested accommodation was necessary under the FHA.  There, the plaintiff had enjoyed the housing of his choice without the accommodation for many years, and he had continued to live in his home for years after the problems that led to his accommodation request.  Here, Plaintiff C.A. could obtain hippotherapy by traveling to a local farm or stable, and, in fact, she did so for some period of time.  (Doc. 1 at 28-29).

As such, the requested accommodation is unnecessary under the FHA to afford Plaintiff Anderson and her family an equal opportunity to enjoy the housing of their choice.

### 2.    Reasonableness

The requested accommodation is that Plaintiff Anderson be allowed conduct hippotherapy for Plaintiff C.A. on her property, but Ellie is not trained to be used in or for such therapy.  As stated above, Dr. Fletcher's letter merely "support[s C.A]'s use of the miniature horse as a means [to being physically active]."  (Doc. 10-9 at 23).  There is no written treatment regimen; and it is Plaintiff  "C.A. dictated" and not administered by a licensed medical or equine professional.  No licensed professionals take part in any session, and these alleged sessions last as long as Plaintiff C.A. tolerates them.

To reiterate the Court's finding in denying Plaintiffs' Motion for Preliminary Injunction, other than for her own convenience, Plaintiff Anderson never explains why the miniature horse must live at her residence.  Hippotherapy can be accomplished by maintaining a miniature horse for Plaintiff C.A.'s use at a local farm or stable or by bringing a miniature horse to her property regularly for a limited period of time.  Plaintiff

Anderson has not established that the miniature horse must be housed at her property, and thus has failed to show such an accommodation is reasonable.

More to the point, Plaintiffs' proposed modification to Defendant's ordinances would fundamentally alter the nature of the zoning scheme. *Woodward v. City of Paris*, 520 F. Supp. 2d 911, 916 (W.D. Tenn. 2007) (citing *Jones v. City of Monroe*, 341 F.3d 474, 480 (6th Cir. 2003) and *Howard*, 276 F.3d at 806). **Municipalities may zone land to accomplish any number of legitimate objectives related to the health, safety, morals, or general welfare of the community**. *N. Ohio Sign Contractors Ass'n v. Lakewood*, 32 Ohio St. 3d 316, 317-318 (1987). **The constitutional right of the individual to use private property has always been subservient to the public welfare under Section 19, Article I of Ohio's Constitution**. *Id*. at 318. "**The protection of real estate from impairment and destruction of value and the maintenance of the aesthetics of a community are legitimate governmental interests that may be** protected by the reasonable exercise of a municipality's police power where such actions bear a substantial relationship to the general welfare of the public. These interests, therefore, may be **properly considered by a legislative body enacting zoning ordinances**." *Id*. (emphasis supplied).

As stated above, Plaintiff Anderson lives in a residential area. Allowing farm animals, such as miniature horses, alpacas, or pigs in these areas fundamentally alters the zoning scheme. The presence of these farm animals potentially creates a threat to the health and safety of the neighboring individuals, as well as the horse itself. 42 U.S.C. § 3604(f)(9). The smell and waste created by the horse potentially creates a direct threat

to the health and safety of Defendant's citizens. As well established, the miniature horse is not housebroken. In Plaintiff Anderson's own words, the property cannot fully accommodate the needs of the horse; it is not big enough for the horse to be "healthy happy." (Doc. 8-1 at 30). Moreover, allowing the horse could also reduce the property value and community aesthetics of this residential area. *See Columbia Oldsmobile v. Montgomery*, 56 Ohio St. 3d 60 (1990).

For the reasons outlined above, the Court finds that Plaintiffs have not shown any genuine dispute of material fact that would preclude summary judgment in favor of Defendant.

## IV. CONCLUSION

Accordingly, based on the foregoing, there being no genuine issues of material fact in dispute, and Defendant being entitled to entry of judgment as a matter of law, Defendant's Motion for Summary Judgment (Doc. 13) is hereby **GRANTED.** The Clerk shall enter judgment accordingly, and this case shall be **CLOSED** in this Court.

**IT IS SO ORDERED**.

Date: 7/7/14                                                    *s/ Timothy S. Black*
                                                                Timothy S. Black
                                                                United States District Judge